UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
PETER GOTTI,                                    :
                                                :       08 Civ. 7178 (HB)
                              Petitioner,        :
                                                :       OPINION & ORDER
              -against-                          :
                                                :
UNITED STATES,                                   :
                                                :
                              Respondent.        :
------------------------------------------------------x

Hon. Harold Baer, Jr., District Judge:

 Peter Gotti ("Petitioner") petitions this Court, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his sentence.  Petitioner claims that (1) the Government impermissibly suppressed favorable evidence that was material to the jury's finding of guilt; (2) the trial judge inadequately investigated a juror's attempt to recant his vote of guilty after the verdict was rendered; and (3) the holding in the United States Supreme Court's recent decision in *United States v. Santos*, 128 S.Ct. 2020 (2008), has invalidated a previous conviction that formed the basis of the jury's verdict and the Court's sentence.  For the reasons that follow, the petition is denied.

## I. BACKGROUND[1]

 At Petitioner's trial, the Government's evidence included extensive proof of the nature and structure of the Gambino Organized Crime Family, a project of the FBI at least since Robert Kennedy was Attorney General.  The Gambino Family had been headed by Petitioner's brother, John Gotti Sr., until the latter was convicted and imprisoned, in part through the testimony of the former Family Underboss Salvatore Gravano.  At the trial of the Petitioner, several other members of the Gambino Family also cooperated and testified for the Government.  Their testimony, among other things, established that after the conviction of John Gotti Sr., the family and its criminal endeavors was directed by a Ruling Panel.  The panel included Petitioner, who shortly assumed the role of Acting Boss.

---

[1] This account of the facts underlying Petitioner's trial and conviction are taken from Petitioner's motion to vacate his sentence, the Government's response and accompanying affidavit, and the Second Circuit's account of the facts on Petitioner's appeal of his conviction, *United States v. Matera*, 489 F.3d 115, 119-20 (2d Cir. 2007).

The cooperators further testified that when Petitioner visited John Gotti Sr. in prison in 1996, the latter urged his brother to kill Gravano, and complained that Gravano's testimony had crippled the family and was "a bill that's gotta be paid."  Petitioner ordered two family members – Thomas Carbonaro and Eddie Garafola – to kill Gravano, whose location had been disclosed in a newspaper article.  Over the course of several months, Petitioner provided approximately $70,000 for elaborate preparations for the murder, including surveillance, travel to Arizona, assumption of disguises, and equipment expenses.  However, before the two would-be assassins could complete their assignment, their plan was foiled when Arizona police arrested Gravano and charged him with distribution of a controlled substance.  At Petitioner's trial, the Government substantiated the plot to murder Gravano with hotel receipts, false identification documents, surveillance, and travel manifests related to the two would-be assassins' numerous "stake-out" missions to Arizona.

At Petitioner's trial, FBI Special Agent Bruce Mouw, who oversaw Gravano's protective detention in Arizona, testified about Gambino Family personnel and activities.  Mouw testified to the existence of a criminal enterprise.  He identified individuals, described FBI procedures, and authenticated union records.  Petitioner later learned that, as a part of its drug investigation into Gravano's drug distribution, the Phoenix police had recorded conversations between Mouw and Gravano (the "Mouw-Gravano tapes").  In these recordings, Mouw informed Gravano about Bosco Radonjich, a leader of another criminal organization.  Gravano reciprocated by informing Mouw about the FBI's investigation of their prior conversations.  Gravano stated that they "better get our stories straight."  However, these recordings, which Petitioner now claims contained exculpatory evidence, were not introduced at Petitioner's trial, nor were they turned over as *Brady* material as Petitioner urges was appropriate.  The Government opines that while the existence of the Phoenix police department's wiretaps had appeared in the media and was therefore known to the public, none of the Assistant United States Attorneys or FBI agents that worked on Petitioner's case possessed the recordings at the time of trial.  Affidavit of Elie Honig ("Honig Aff.") at ¶ 6.

In addition to the testimony surrounding the plot to kill Gravano orchestrated by the Petitioner, two members of the Gambino Family testified that Petitioner was a member of the Construction Panel, which was made up of ranking Gambino family members and allowed its members to extort money and "cushy" no-work jobs from construction companies, and allowed

construction companies to hire non-union workers and pay non-union wages without trouble from the unions.  The Gambino Family witnesses testified that the Construction Panel extorted tens of millions of dollars in this manner.  The witnesses further testified to Petitioner's personal participation and extortion in the construction industry through his role on the Panel.

Petitioner was convicted of racketeering, conspiracy to racketeer, conspiracy to murder, and extortion and was sentenced to 25 years in prison, 3 years of supervised release, and a $400 special assessment.  On the day after the jury convicted Petitioner, but before the Court passed sentence, Petitioner claimed that one juror, "Juror Seven," attempted to recant his guilty verdict. Judge Casey, who presided over the trial, interviewed the juror in the presence of the attorneys, but determined that an evidentiary hearing was not necessary.  No further inquiry was conducted regarding Juror Seven's alleged attempt to recant.

Following his conviction, Gotti appealed to the Court of Appeals for the Second Circuit, in which he raised numerous arguments, including challenges to the receipt in evidence of uncharged crimes, expert testimony, and recordings of jailhouse conversations; challenges to the constitutionality and reasonableness of his sentence; and challenges relating to the venue of the prosecutions and to the allegedly ineffective assistance of his counsel.  *See United States v. Matera*, 489 F.3d 115, 118-25 (2d Cir. 2007).  On May 30, 2007, the Second Circuit denied all of Petitioner's claims and affirmed the judgment of the District Court.  *Id.*  Subsequently, the United States Supreme Court denied his petition for certiorari.  *Matera v. United States*, 128 S.Ct. 424 (2007).

## II. STANDARD OF REVIEW

The court will grant a petition for *habeas corpus* under 28 U.S.C. § 2255, only if (1) the Petitioner's sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; or (3) the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.  *See Woodard v. United States*, No. 04 Civ. 9695, 2005 U.S. Dist. LEXIS 26802, at *6 (S.D.N.Y. Nov. 8, 2005) (citing *Johnson v. United States*, 313 F.3d 815, 817 (2d Cir. 2002)); *see also United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) ("[A] collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice'") (quoting *Hill v. United*

*States*, 368 U.S. 424, 428 (1962)).  On a petition for *habeas corpus*, the petitioner bears the burden to prove his allegations by a preponderance of the evidence.  *Whitaker v. Meachum*, 123 F.3d 714, 716 (2d Cir. 1997) (citing, *inter alia*, *Walker v. Johnston*, 312 U.S. 275, 286 (1941)); *see also United States v. Frady*, 456 U.S. 152, 166 (1982), *reh'g denied*, 456 U.S. 1001 ("We reaffirm the well-settled principle that to obtain collateral relief [under § 2255] a prisoner must clear a significantly higher hurdle than would exist on direct appeal.").

### III. DISCUSSION

**A.     Each of Petitioner's Claims is Procedurally Barred.**

        As noted above, Petitioner raises three distinct grounds as collateral challenges to his sentence: (1) failure to produce allegedly exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) failure to conduct an evidentiary hearing following a juror's attempted recantation of a vote of guilty; and (3) the violation by the Government of the prohibition against the use of a previous conviction in the wake of *United States v. Santos*, 128 S.Ct. 2020 (2008).

        At the outset, it appears that each of Petitioner's claims is procedurally barred.  It is well-settled that a petition for *habeas corpus* may not provide a second bite at the apple, *i.e.*, another chance to raise issues that were or could have been raised on appeal.  *E.g.*, *Frady*, 456 U.S. at 165 ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal.") (collecting cases).  Where a defendant has failed to raise a matter on appeal, the claim may be raised on a *habeas* petition only if the defendant can first demonstrate either (1) cause and actual prejudice, or (2) actual innocence.  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350-51 (2006); *Bousley v. United States*, 523 U.S. 614, 622 (1998); *Frady*, 456 U.S. at 167-68. To determine what constitutes "cause" in this context, the U.S. Supreme Court consistently has held that, "[s]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective. . . , [there is] no inequity in requiring him to bear the risk of attorney error that results in a procedural default."  *Coleman v. Thomson*, 501 U.S. 722, 752 (1991), *reh'g denied*, 501 U.S. 1277; *id.* at 752 ("Attorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation and petitioner must bear the risk of attorney error.") (internal quotation and citation omitted); *see also Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[W]e think that the existence of cause for a

procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts. . . .").

In this case, each of the claims Petitioner now raises on collateral review was available to him at trial and on appeal, yet he failed to raise them either to this Court or on appeal.

### 1. *Claims Regarding the Mouw-Gravano Tapes*

First, Petitioner had actual, or constructive, knowledge of the Mouw-Gravano tapes at least as of the time of his trial in late 2004, because there had been news accounts recounting the fact that the Phoenix police department had made recordings during their investigation of Gravano's drug distribution activities. Neither before nor during trial did Petitioner request the Government to turn over the Mouw-Gravano tapes, nor on appeal did he argue, nor could he, that failure to do so constituted a *Brady* violation. Petitioner fails to explain why he did not pursue the tapes or raise the issue earlier. More importantly, no argument is made as to how he may have been prejudiced by not having access to the tapes at trial. Therefore, Petitioner has failed to overcome the procedural bar to his claim concerning the Mouw-Gravano tapes.

### 2. *Claims Regarding Juror 7*

Petitioner was obviously aware of Juror Seven's attempted recantation, but failed to raise the issue in the Second Circuit on appeal. Petitioner certainly had notice of the claim since December 24, 2004 – the day after the guilty verdict was rendered, long before any appeal. Thus, the argument was available on appeal, but not raised. Once again, Petitioner has not shouldered his burden to establish cause for his failure to raise the issue in the Second Circuit. Therefore, Petitioner's second claim for relief is similarly procedurally barred.

### 3. *Claims Regarding the* Santos *Decision*

Finally, Petitioner claims that the U.S. Supreme Court's recent decision in *United States v. Santos*, 128 S.Ct. 2020 (2008), decided after Petitioner's appeal to the Second Circuit was decided, applies retroactively and invalidates his 2003 conviction for money laundering under 18 U.S.C. § 1956 in the Eastern District and thus his petition must be granted and his present sentence and conviction in this Court be set aside.

In *Santos*, the Supreme Court addressed the definition of the term "proceeds" in the federal money laundering statute when applied to an illegal gambling operation. The statute

proscribes, *inter alia*, conducting "a financial transaction which in fact involves the *proceeds* of specified unlawful activity. . . ."  18 U.S.C. § 1956(a)(1) (emphasis added).

A plurality of four justices found that "proceeds" always means "profits."  *Santos*, 128 S.Ct. at 2025.  Justice Scalia, writing for the plurality, opined that there was nothing in the statute to indicate whether "proceeds" indicated "profits" or "gross receipts."  Therefore, the Court applied "the rule of lenity," and wrote, "ambiguous criminal laws [must be] interpreted in favor of the defendants subjected to them."  *Id.*  The plurality therefore adopted the "defendant-friendly" approach that the statute forbids only laundering of profits, as opposed to gross receipts.  *Id.*  Justice Stevens concurred in the result, and provided the necessary fifth vote, but concluded that "proceeds" only necessarily meant "profits" in the context of an illegal gambling enterprise.  Specifically, Justice Stevens found that "[t]he revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the meaning of the money laundering statute."  *Id.* at 2033 (Stevens, J., concurring).  In concluding that the meaning of "proceeds" depends on the context of the statute's application, as Justice Stevens did, he took issue with the plurality's finding that "proceeds" always meant "profits."  *Id.*

Although *Santos* was decided after Petitioner's trial, and the decision on his appeal, and there is no indication in the opinion that it is to have retroactive effect,[2] the fact is the argument with regard to the meaning of the statutory language under *Santos* was available to him on appeal.  Put another way, when an appellant defaults by failing to raise a claim on appeal, "the question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all."  *Johal v. United States*, C08-1075-RSL-BAT, 2009 WL 210709, at *6-8 (W.D. Wash. Jan. 28, 2009) (quoting *Smith v. Murray*, 477 U.S. 527, 537 (1986)).  In this case, at the time of Petitioner's appeal, several other

---

[2] The U.S. Supreme Court has held that a new rule of law does not apply retroactively unless the Court expressly holds that it so applies.  *Tyler v. Cain*, 533 U.S. 656, 662 (2001); see also *Forbes v. United States*, 262 F.3d 143, 145 (2d Cir. 2001).  Moreover, the few cases that have addressed the specific question of whether the plurality's decision in *Santos* is to be retroactively applied have expressly found that it is not.  *See, e.g.*, *United States v. Iacaboni*, No. 01-CR-30025-MAP, 2009 WL 70055, at *2 (D. Mass. Jan. 8, 2009) (stating that neither the Supreme Court nor the First Circuit has held that *Santos* applies retroactively); *United States v. Pryce*, No. CV 08-4456 PA, 2008 WL 2945449, at *3 (C.D. Cal. Nov. 6, 2008) ("[T]he United States Supreme Court has not held that *Santos* applies retroactively on collateral review."); *Vaughan v. United States*, 08CV330-T-02, 2008 WL 2945449, at *3 (W.D.N.C. July 25, 2008) ("[T]he Supreme Court did not rule that its holding [in *Santos*] could be retroactively applied in collateral proceedings or otherwise.").

courts had decided the precise issue regarding the meaning of "proceeds" under § 1956 that the Supreme Court ultimately would decide in *Santos*.  *See, e.g.*, *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005); *United States v. Grasso*, 381 F.3d 160, 167 (3d Cir. 2004), *vacated and remanded on other grounds*, 544 U.S. 945 (2005); *United States v. Iacoboni*, 363 F.3d 1, 5-6 (1st Cir. 2005); *United States v. Scialabba*, 282 F.3d 475, 478 (7th Cir. 2002); *see also Johal*, 2009 WL 210709, at *8-9 (discussing pre-*Santos* cases addressing the definition of the word "proceeds" under § 1956(a)(1)).  "Indeed at the time of [Petitioner's appeal], the Federal Reporters were replete with cases involving" the very same challenge as that which was at issue in *Santos*, s*ee Bousley*, 523 U.S. at 622, and yet the issue was never raised either below or on appeal.

In sum, each of the arguments Petitioner brings on the instant *habeas* petition was available to him at the time of his appeal, but he chose not to raise them and he has shown no reason for that failure on this petition.  Consequently, there is no need to address whether there is actual prejudice sufficient to overcome the procedural bar.  As Petitioner also has not argued that he is actually innocent, the Court finds that all of his claims on this petition are procedurally barred.  However, in accordance with this Circuit's preference for adjudicating claims on the merits, this Court further finds, as detailed below, that even if Petitioner was not procedurally barred from raising these claims, they lack merit.  *See Gotti v. United States*, 08-CV-2664, 2009 WL 197132, at *1 (E.D.N.Y. Jan. 28, 2009).

**B.    Petitioner's Substantive Claims Have No Merit.**

*1.  Claims Regarding the Mouw-Gravano Tapes*

Petitioner claims that the Government impermissibly suppressed tape recordings that could have been used to exculpate him or to impeach Mouw's testimony.  He claims that he learned of the recordings in 2007 and that, had they been available to him at trial, he could have used them to "undermine the integrity of the FBI, . . . establish[] Mouw's bias and motive to fabricate for Gravano, . . . [or] ma[ke] informed decisions regarding calling potentially hostile witnesses."  Pet. at 11-12.  The Government counters that it did not violate *Brady*'s disclosure requirements, because it did not possess the tapes or know the contents of the recordings.  The Government also asserts that the tapes' purported usefulness does not convey a reasonable likelihood of a different result.  *See* Memorandum of Law of the United States of America in Opposition to Defendant's Motion to Vacate ("Opp.") at 16-17.

In *Brady v. Maryland*, the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  The Second Circuit has interpreted *Brady* to require the defendant, in order to prevail, to show two things: "(1) that the government failed to disclose favorable evidence, and (2) that the evidence it 'suppressed' was material."  *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995).  The Court subsequently explained that the requirement that the evidence be material requires that the evidence "could . . . in any reasonable likelihood have affected the judgment of the jury."  *Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also United States v. Bagley*, 473 U.S. 667, 674-75 (1985) ("A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.") (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)).  The Court since has held that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Bagley*, 473 U.S. at 682; *see also Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (applying *Bagley* standard); *United States v. Spinelli*, 551 F.3d 159, 164-65 (2d Cir. 2008) (finding "undisclosed information is deemed material so as to justify a retrial only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different") (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)).  This materiality standard is not a question of "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.

In addition to exculpatory evidence, the *Brady* disclosure requirement also encompasses evidence that could have been used to impeach a witness.  *Bagley*, 473 U.S. at 676; *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998); *Payne*, 63 F.3d at 1210.  In general, impeachment evidence has been found to be material "where the witness supplied the only evidence linking the defendant(s) to the crime, . . . or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case."  *Payne*, 63 F.3d at 1210 (internal quotations and citations omitted); *see also Avellino*, 136 F.3d at 256.  On the other hand,

impeachment evidence is not material if the testimony of the witness was corroborated, or when the suppressed evidence "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable."  *Payne*, 63 F.3d at 1210 (internal quotations and citations omitted).  Undisclosed impeachment evidence is not material under *Brady* when, "although possibly useful to the defense, it is not likely to have changed the verdict."  *Avellino*, 136 F.3d at 257.

The Second Circuit has held that, "[u]nder *Brady* and its progeny, the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense," and the individual prosecutor will be presumed to have knowledge of all information gathered in connection with the government's investigation.  *Payne*, 63 F.3d at 1208 (citing *Kyles*, 514 U.S. at 437 ("[T]he individual prosecutor in each case has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police.")).  Despite this caution to prosecutors, the Second Circuit in *Avellino* went on to write:

> knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [the court] to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.

136 F.2d at 255 (internal quotations and citations omitted); *see also United States v. Locascio*, 6 F.3d 924, 949-50 (2d Cir. 1993) (refusing to impute knowledge to Assistant United States Attorney prosecuting that action based on reports of FBI agents "uninvolved in the investigation or trial of the defendants-appellants"); *United States v. Quinn*, 445 F.2d 940, 943-44 (2d Cir. 1971) (refusing to impute knowledge of a Florida prosecutor to an Assistant United States Attorney in New York; rejecting as "completely untenable [the] position that knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor").  Moreover, evidence is not considered to have been suppressed under *Brady* "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence."  *Payne*, 63 F.3d at 1208 (internal quotation and citations omitted).  Thus, documents that are part of the public records are not deemed suppressed if defense counsel

should know of them and fails to obtain them due to a lack of diligence in his own investigation. *Id.*

Here, the Government contends that it did not violate its disclosure obligations under *Brady* by not turning over the Mouw-Gravano tapes for two reasons: first, because it did not possess or have knowledge of the tapes; and second, because there was nothing in the tapes that carried material exculpatory or impeachment value.  With respect to the Government's knowledge, Petitioner alleges, without factual support, that the Mouw-Gravano tapes "were apparently forwarded to prosecutors in the Southern District of New York prior to [Petitioner's] trial in November 2004" and were "apparently withheld."  Pet. at 3, 7.  The Government counters that neither prosecutors nor FBI agents working on Petitioner's case ever received or possessed the Mouw-Gravano tapes at the time of trial.  Honig Aff. ¶ 6.  Rather, the only knowledge the Government had was that the Arizona state authorities had investigated and arrested Gravano for drug trafficking.  *Id.* ¶ 3-4.  However, the Government does concede that it had the same knowledge of the existence of the tapes as Petitioner had, i.e., from stories in the media.  *Id.* ¶ 6. But for the procedural bar, and the substantive use to which the tapes could have been put, or lack thereof, this concession by the Government would raise significant concern for the Court.

The fly in the ointment is the failure on Petitioner's part to explain how the fact of an allegedly ongoing relationship between Gravano and Mouw could have impeached Mouw's testimony.  Gravano did not testify at the trial, and apparently his only role at the trial was as the target that Petitioner had directed be killed.  Evidence of the plot to kill Gravano and Gravano's drug trafficking were affirmatively introduced by the Government, and it is not clear how any of this information would have been grist for impeachment with respect to any of the witnesses who testified.  Moreover, although Mouw testified at trial, his testimony went solely to the existence of the charged enterprise, which was corroborated by overwhelming evidence at trial.  *See* Opp. at 26-27 (citing transcript excerpts).  Thus, even if Petitioner had demonstrated that the ongoing relationship with Gravano could have been used to impeach Mouw in some way, that evidence was not material and under *Brady* and its progeny not required to be produced.  Furthermore, Petitioner conclusorily states that disclosure of the Mouw-Gravano tapes would have enabled him to make educated decisions about whether to call hostile witnesses, but he comes with no facts to support this contention.  Once again I find that Petitioner has failed to meet his burden on this prong of the petition and relief must be denied.

2. *Claims Regarding Juror 7*

Petitioner additionally contends that, following the jury's verdict, Juror Seven approached the Court and attempted to change his vote.  Petitioner argues for an evidentiary hearing. Interestingly, neither side produced a transcript of the meeting with the juror, counsel and Judge Casey.

Petitioner concedes that Rule 606(b) of the Federal Rules of Evidence generally proscribes inquiries into jury deliberations.  Rule 606(b) is grounded in the common-law rule against admission of juror testimony to impeach a verdict and the exception for juror testimony relating to jury tampering.  *Tanner v. United States*, 483 U.S. 107, 121 (1987).  The rule provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Fed. R. Evid. 606(b); *see also Manley v. Ambase Corp.*, 337 F.3d 237, 251 (2d Cir. 2003) ("Rule 606(b) precludes such an inquiry into the 'mind or emotions' of deliberating jurors."); *United States v. Thomas*, 116 F.3d 606, 620 (2d Cir. 1997) ("The mental processes of a deliberating juror with respect to the merits of the case at hand must remain largely beyond examination and second-guessing, shielded from scrutiny by the court as much as from the eyes and ears of the parties and the public.").  A petitioner may meet an exception to this rule "only if he can make a showing of significant new objective facts which strongly tend to prove that [those facts] tainted one or more of the other jurors." *United States v. Moten*, 582 F.2d 654, 660 (2d Cir. 1978).

Petitioner's contention that at the least "an evidentiary hearing should be ordered," Pet. at 13, might carry some weight but for the fact that he has failed to produce a scintilla of evidence that the recantation was the result of jury tampering, nor is there any such allegation in the record.  *See Ida v. United States*, 191 F. Supp. 2d 426, 432-33 (S.D.N.Y. 2002) (finding no basis

for a hearing on the claim of possible jury tampering when movant had come forward with no evidence of improper contact with the jury). Indeed, according to Petitioner's account of the relevant facts, the Court did inquire into the reason for Juror Seven's attempted recantation in an interview in chambers in the presence of all attorneys. *See* Pet. at 8. Petitioner has produced no evidence to support his contention that this inquiry was inadequate under the circumstances, and therefore any further evidentiary hearing cannot be justified under Federal Rule of Evidence 606(b).

### 3. *Claims Regarding the* Santos *Decision*

Finally, Gotti moves to vacate his conviction because his previous conviction in the Eastern District of New York, which he claims impacted his conviction and sentence in this Court, was invalidated by the Supreme Court's decision in *United State v. Santos*. The Government argues that the Court's *Santos* decision does not apply retroactively, and that even if it did have retroactive application, it would not invalidate Petitioner's conviction or sentence. I share this view and find that the definition of "proceeds" as "profits" in *Santos* squarely encompasses the payments made to Petitioner that were the basis for his § 1956 conviction for money laundering and conspiracy to launder money. For further discussion on this score, see Judge Block's decision in *Gotti*, 2009 WL 197132 (denying habeas relief from Petitioner's underlying conviction in the Eastern District of New York) and my discussion about the denial of the petition on procedural grounds, *supra* Section III(A)(3).

## IV. CONCLUSION

For the foregoing reasons, the petition for a writ of *habeas corpus* is DENIED. A certificate of appealability will not issue because Petitioner has failed to make a substantial showing of the denial of a federal right. *See* 28 U.S.C. § 2253. The Clerk is directed to close this matter and remove it from my docket.

**IT IS SO ORDERED**
**New York, New York**
**April 5, 2009**

U.S.D.J.

12